## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| DARRYL TAYBORN, on behalf of himself and all others similarly situated, | : : : | |
| | : | Civil Action No. 1:19-cv-1040 |
| Plaintiff, | : : | |
| v. | : : | |
| | : | **JURY TRIAL DEMAND** |
| VIBRANT CREDIT UNION, | : : | |
| Defendant. | : : | |
| _____ | : | |

## CLASS ACTION COMPLAINT

Plaintiff, Darryl Tayborn, by counsel, and for him Class Action Complaint against Vibrant Credit Union, alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action on behalf of themselves and classes of all similarly situated consumers against Vibrant Credit Union ("Vibrant"), arising from its routine practice of (a) assessing Overdraft Fees on transactions that did not actually overdraw a checking account; and (b) assessing more than one non-sufficient funds fee ("NSF Fee") on the same item.

2.    Vibrant misleadingly and deceptively misrepresents these practices, including in its own account contracts. Vibrant also omits material facts pertaining to each of the above practices, including its account contracts.

3.    This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

4.    As described herein, Defendant's practices violate Illinois common and statutory law, as well as the Defendant's own form contracts.

5.     Defendant's improper scheme to extract funds from accountholders already struggling to make ends meet has victimized Plaintiff and thousands of others. Unless enjoined, Defendant will continue to engage in these schemes and cause substantial injury to its checking account holders.

## JURISDICTION

6.     This Court has original jurisdiction over this putative class action because Defendant is at home in this State. Defendant regularly and systematically conducts business and provides retail banking services in this State and provides retail banking services to customers in this State, including Plaintiff and members of the putative Class. As such, it is subject to the jurisdiction of this Court.

7.     Venue is appropriate under 735 ILCS 5/2-101because Defendant maintains its principal office in this County and is the only Defendant in this action.

## PARTIES

8.     Plaintiff Darryl Tayborn is a citizen of Iowa and resident of Davenport, Iowa. Plaintiff has a personal checking account with Vibrant, which is governed by a Deposit Agreement.

9.     Defendant Vibrant is one of the largest credit unions in Illinois. It has $600 million in assets and maintains its headquarters in Moline, Illinois.

## BACKGROUND FACTS

### I.   VIBRANT CHARGES OVERDRAFT FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

#### A.   Overview of Claim

10.    Plaintiff brings this cause of action challenging Vibrant's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

11.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Vibrant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Vibrant has already sequestered these funds for payment.

12.    However, Vibrant still assesses crippling $29 Overdraft Fees on many of these transactions and mispresents its practices in its account documents.

13.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Vibrant later assesses Overdraft Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN transactions.

14.    Vibrant maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Vibrant sequesters the funds needed to pay the transaction,

subtracting the dollar amount of the transaction from the customer's available balance. Such

funds are not available for any other use by the accountholder, and such funds are specifically

associated with a given debit card transaction.

15.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to

ensure that there are enough funds in the account to pay the transaction when it settles, as

discussed in the Federal Register notice announcing revisions to certain provisions of the Truth

in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on
> funds in the consumer's account to ensure that the consumer has sufficient funds in
> the account when the transaction is presented for settlement. This is commonly
> referred to as a "debit hold." During the time the debit hold remains in place, which
> may be up to three days after authorization, those funds may be unavailable for the
> consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration,

Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 2009).

16.    That means when any *subsequent*, intervening transactions are initiated on a

checking account, they are compared against an account balance that has already been reduced to

account for any earlier debit card transactions. This means that many subsequent transactions

incur Overdraft Fees due to the unavailability of the funds sequestered for those debit card

transactions.

17.    Still, despite keeping those held funds off-limits for other transactions, Vibrant

improperly charges Overdraft Fees on those APPSN Transactions, although the APPSN

transactions ***always*** have sufficient available funds to be covered.

18.    Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed

concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

A financial institution authorized an electronic transaction, which reduced a

customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

19.    There is no justification for these practices, other than to maximize Vibrant's overdraft fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. Vibrant is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Vibrant was not content with these millions in Overdraft Fees. Instead, it sought millions *more* in Overdraft Fees on these APPSN Transactions.

20.    Besides being deceptive, unfair, and unconscionable, these practices breach promises made in Vibrant's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of Vibrant's processes and practices. These practices also exploit contractual discretion to gouge consumers.

21.    In plain, clear, and simple language, the contract documents covering Overdraft Fees promise that Vibrant will only charge Overdraft Fees on transactions that have insufficient funds to cover that transaction.

22.    In short, Vibrant is not authorized by contract to charge Overdraft Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

23.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Vibrant. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Vibrant, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

24.    At this step, if the transaction is approved, Vibrant immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

25.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

26.    There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**C.  <u>Vibrant's Account Contract</u>**

27.     Plaintiff has a Vibrant checking account, which is governed by Vibrant's standardized Your Account Disclosure (the "Deposit Agreement"). A true and accurate copy of the Deposit Agreement is attached as Exhibit A.

28.     The Deposit Agreement and relevant contract documents covering Overdraft Fees provide that Vibrant will not charge Overdraft Fees on transactions that have sufficient funds to cover them at the time they are authorized.

29.     Vibrant repeatedly promises that it will use available funds are reduced for holds, including those placed immediately on debit card transactions, and those holds are maintained until posting:

> You may use your debit card at Point-of-Sale terminals to make purchases or pay for services. You may also use your debit card to withdraw cash from either savings or checking at an Automated Teller Machine (ATM). **For merchant purchases, Vibrant has the right to place a temporary hold on your account in an amount equal to the authorization amount received through the payment authorization system.** In certain circumstances, the payment authorization system permits the authorization amount Vibrant receives to be more or less than the final amount of the transaction. This typically happens when the final amount of your purchase is not known at the moment when you or the merchant "swipes" your card for authorization. In this situation, Vibrant reserves the right to place a temporary hold on your account in an amount Vibrant determines is reasonable based on the type of the transaction. **Until the transaction finally settles, or Vibrant determines that it is unlikely to be processed, the funds subject to the hold will not be available to you for other purposes. Vibrant will only charge your account for the amount of the final transaction, and will release any excess amount when the transaction finally settles.**
>
> […]
>
>  Your account may have a negative or zero available balance even though funds are actually in your account. This may happen if funds are on hold for any reason. If items are submitted to your account during any time your account has a zero or negative available balance, we may charge you a Returned Item/NSF or Courtesy Pay fee according to our current fee schedule.

Deposit Agreement, Ex. A (emphasis added).

30.     The Deposit Agreement states that the credit union's decision whether to "honor" a transaction is the relevant point for determining whether an Overdraft Fee applies:

> Overdraft: You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. Whether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule.

*Id*. (emphasis added).

31.     Via these provisions of the Deposit Agreement, Vibrant promises that it uses available balance—the same balance that is immediately reduced when a debit card transaction is authorized—to determine whether an overdraft occurs and a fee is assessed.

32.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Vibrant assesses Overdraft Fees on them anyway.

33.     The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APPSN Transactions.

34.     In fact, Vibrant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

35.     All the above representations and contractual promises are untrue. In fact, Vibrant charges Overdraft Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Vibrant may impose Overdraft Fees on any APPSN Transactions.

36.     The account documents misconstrue Vibrant's true debit card processing and overdraft practices.

37.     First, and most fundamentally, Vibrant charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

38.     Vibrant assesses Overdraft Fees on APPSN Transactions that **do** have sufficient funds available to pay them throughout their lifecycle.

39.     Vibrant's practice of charging Overdraft Fees even when sufficient available funds exist to pay a transaction violates its contractual promise not to do so. This discrepancy between Vibrant's actual practice and the contract causes consumers like Plaintiff to incur more overdraft fees than they should.

40.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

41.     Because these withdrawals take place upon authorization, they cannot be re-debited later. But that is what Vibrant does when it re-debits the account during a secret batching posting process.

42.     In reality, Vibrant's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

43.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Vibrant cannot then charge an Overdraft Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

44.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Vibrant does something new and unexpected, during its nightly batch posting process. Specifically, Vibrant releases the hold placed on funds for the

transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

45.    This secret step allows it to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Vibrant specifically set aside money to pay.

46.    This discrepancy between Vibrant's actual practices and the contract causes consumers to incur more overdraft fees than they should.

47.    In sum, there is a huge gap between Vibrant's practices as described in the account documents and Vibrant's practices in reality.

**D.  <u>Vibrant Abuses Contractual Discretion</u>**

48.    Vibrant's treatment of debit card transactions to charge Overdraft Fees is not simply a breach of the express terms of the numerous account documents. In addition, Vibrant exploits its contractual discretion to the detriment of accountholders when it uses these policies.

49.    The terms "to honor" a transaction and "temporary hold" are undefined. Vibrant uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of that term. In Vibrant's implied definition, a balance is insufficient to "honor" or cover a transaction even if Vibrant sequesters sufficient available funds for that transaction at the time it is made.

50.    Moreover, Vibrant uses its contractual discretion to cause APPSN Transactions to incur Overdraft Fees by knowingly authorizing later transactions that consume available funds previously sequestered for APPSN Transactions, and by allowing holds to expire or be consumed before posting.

51.     Vibrant uses all of these contractual discretion points unfairly to extract Overdraft Fees on transactions that no reasonable consumer would believe could cause Overdraft Fees.

**E.  Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

52.     The assessment of Overdraft Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

53.     Vibrant was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

54.     Vibrant knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they don't allow debt like credit cards do and because the money comes directly out of a checking account.

55.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), http://www.consumeraction.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_deb it_card (last visited June 8, 2016).

56.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited September 16, 2019).

57.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch (Mar. 23, 2016), http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

58.     Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

59.     Vibrant was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its Deposit Agreement only supports this perception.

**F.  Plaintiff's Debit Card Transactions**

60.     As one example, on October 26, 2017, Plaintiff was assessed two Overdraft Fees in the amount of $29.00 each on debit card transactions that settled that day, despite the fact that

positive funds were deducted immediately, one or more days prior, for the transactions on which Plaintiff was assessed Overdraft Fees.

## II.    VIBRANT CHARGES TWO OR MORE NSF FEES ON THE SAME ITEM

61.    As alleged more fully herein, Vibrant's Deposit Agreement and Fee Schedule allow it to charge a single, $29 NSF Fee when an item, including an electronic payment item, is returned for insufficient funds.

62.    In contrast to its Deposit Agreement, however, Vibrant regularly assesses two or more NSF Fees on the *same* item.

63.    This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed. Instead, Chase charges one NSF Fee even if a transaction is resubmitted for payment multiple times.[1]

64.    Worse, Vibrant's Deposit Agreement never discloses this practice. To the contrary, Vibrant's Deposit Agreement indicates it will only charge a single NSF Fee per item or transaction.

### A.  Plaintiff's Experience

65.    In support of him claims, Plaintiff offers an example of an NSF Fee that should not have been assessed against him checking account. As alleged below, Vibrant: (a) reprocessed a previously declined transaction; and (b) charged an additional fee upon reprocessing.

66.    On September 15, 2016, Plaintiff attempted an electronic payment on her Best Buy credit card for $25.

---

[1] As indicated by Chase's printed disclosures, an "item" maintains its integrity even if multiple processes are affected on it: "If we return the same item multiple times, we will only charge you one Returned Item Fee for that item within a 30-day period."

67.    Vibrant rejected payment of that item due to insufficient funds in Plaintiff's account and charged him a $29 NSF Fee for doing so. Plaintiff does not dispute the initial fee, as it is allowed by Vibrant'ss Deposit Agreement.

68.    Unbeknownst to Plaintiff and without him request to Vibrant to retry the item, however, four days later, on September 19, 2016, Vibrant processed the same item yet again, and again Vibrant rejected the item due to insufficient funds and charged Plaintiff *another* $29 NSF Fee.

69.    Unbeknownst to Plaintiff and without him request to Vibrant to retry the item, however, two days later, on September 21, 2016, Vibrant processed the same item yet again, and again Vibrant rejected the item due to insufficient funds and charged Plaintiff another $29 NSF Fee.

70.    *In sum, Vibrant charged Plaintiff $87 in fees to attempt to process a single payment.*

71.    Plaintiff understood the payment to be a single item as is laid out in Vibrant's contract, capable at most of receiving a single NSF Fee (if Vibrant returned it) or a single Overdraft Fee (if Vibrant paid it).

72.    The same pattern occurred with respect to a different item on August 7, 2019 and August 13, 2019.

**B.    The Imposition of Multiple NSF Fees on a Single Transaction Violates Vibrant's Express Promises and Representations**

73.    Vibrant's Deposit Agreement states that a singular NSF Fee can be assessed on checks, ACH debits, and electronic payments.

74.    Vibrant's Deposit Agreement states that it will charge "a" single fee of $29 "per item" or "withdrawal request" that is returned due to insufficient funds. For example, the Deposit Agreement states:

Overdraft: You understand that we may, at our discretion, **honor withdrawal requests** that overdraw your account. Whether the **item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule**.

[…]
If **items** are submitted to your account during any time your account has a zero or negative available balance, we may charge you **a Returned Item/NSF** or Courtesy Pay fee according to our current fee schedule.

Ex. A at 3 (emphasis added).

75.    In the example above, Plaintiff herself made a single "withdrawal request" to pay his Best Buy credit card.

76.    This language causes reasonable consumers to believe that a transaction is capable of receiving, at most, a single Overdraft Fee or NSF Fee per "item."

77.    The Fee Schedule reinforces this understanding and promises that, at most, a <u>single</u> fee will be assessed when an "item" is returned:

Overdraft Fees Courtesy Pay $29.00 per item
Returned Item/NSF $29.00 per item

78.    The same "item" on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

79.    There is zero indication anywhere in the Deposit Agreement that the same "item" is eligible to incur multiple NSF Fees.

80.    Even if Vibrant reprocesses an instruction for payment, it is still the same "item." The Credit Union's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

81.    The disclosures described above never discuss a circumstance where Vibrant may assess multiple NSF Fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

82.    In sum, Vibrant promises that one $29 NSF Fee will be assessed "per item," and these terms must mean all iterations of the same instruction for payment. As such, Vibrant breached the contract when it charged more than one fee per item.

83.    Reasonable consumers understand any given authorization for payment to be one, singular "item," as that term is used in Vibrant's Deposit Agreement.

84.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which Vibrant will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does Vibrant disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do Vibrant customers ever agree to such fees.

85.    Customers reasonably understand, based on the language of the Deposit Agreement and Vibrant's other Deposit Agreement, that the Credit Union's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees. In other words, it is always the same item or transaction.

86.    Banks and credit unions like Vibrant that employ this abusive practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something Defendant here never did.

87.    For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as Vibrant, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Deposit Account Agreement*, First Citizen's Bank (Sept. 2018), https://www.firstcitizens.com/ personal/banking/deposit-agreement (emphasis added).

88.    First Hawaiian Bank engages in the same abusive practices as Defendant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://www. fhb.com/ en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_ RXP1.pdf (last accessed September 16, 2019) (emphasis added).

89.    Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

*Consumer and Small Business Online Access Agreement*, Klein Bank ¶ H,

https://www.kleinbankonline.com/bridge/disclosures/ib/disclose.html (last accessed September

16, 2019) (emphasis added).

90.     Central Pacific Bank, a leading bank in Hawai'i, states in its Fee Schedule under

the "MULTIPLE NSF FEES" subsection: "Items and transactions (such as, for example, checks

and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF")

funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be

imposed on you each time an item and transaction resubmitted for payment is returned due to

insufficient/nonsufficient funds." *Miscellaneous Fee Schedule*, Central Pacific Bank 1 (Feb. 15,

2019), https://www.centralpacificbank.com/PDFs/Miscellaneous-Fee-Schedule.aspx.

91.     BP Credit Union likewise states: "We may charge a fee each time an item is

submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result

of a returned item and resubmission(s) of the returned item."

92.     Vibrant provides no such disclosure, and in so doing, deceives its accountholders.

**C.  The Imposition of Multiple NSF Fees on a Single Transaction Breaches Vibrant's Duty of Good Faith and Fair Dealing**

93.     Parties to a contract are required not only to adhere to the express conditions in the

contract, but also to act in good faith when they are invested with a discretionary power over the

other party. In such circumstances, the party with discretion is required to exercise that power and

discretion in good faith. This creates an implied promise to act in accordance with the parties'

reasonable expectations and means that Vibrant is prohibited from exercising its discretion to

enrich itself and gouge its customers. Indeed, Vibrant has a duty to honor transaction requests in a

way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion

to pile on ever greater penalties on the depositor. Here—in the adhesion agreements Vibrant foisted

on Plaintiff and its other customers—Vibrant has provided itself numerous discretionary powers affecting customers' credit union accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Vibrant abuses that discretion to take money out of consumers' account without their permission and contrary to their reasonable expectations that they will not be charged multiple NSF Fees for the same transaction.

94. Vibrant exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defines "item" in a way that directly leads to more NSF Fees. Further, Vibrant abuses the power it has over customers and their credit union accounts and acts contrary to their reasonable expectations under the Deposit Agreement. This is a breach of Vibrant's implied covenant to engage in fair dealing and act in good faith.

95. By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one NSF Fee on a single item, Vibrant breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

96. It was bad faith and totally outside Plaintiff's reasonable expectations for Vibrant to use its discretion to assess two or three NSF Fees for a single attempted payment.

97. When Vibrant charges multiple NSF Fees, it uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations. Vibrant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more NSF Fees.

## CLASS ACTION ALLEGATIONS

98.    Plaintiff brings this action on behalf of themselves and all others similarly situated pursuant to 735 ILCS 5/2-801. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of 735 ILCS 5/2-801.

99.    <u>Description of the Classes</u>: Plaintiff brings this class action on behalf of themselves and four classes of persons ("the Classes") defined as follows:

> All consumers who, during the applicable statute of limitations, were charged Overdraft Fees on debit card transactions that did not overdraw a Vibrant checking account at the time of authorization (the "APPSN Class").

> All consumers who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item on a Vibrant checking account (the "Multiple NSF Class").

100.    Excluded from the Classes are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

101.    The time period for each of the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Vibrant remedies the conduct complained of herein.

102.    <u>Numerosity</u>: The members of the proposed Classes are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Classes are unknown at this time and can be ascertained only through appropriate discovery. Plaintiff estimates the number of members in each Class to be in the thousands.

103.   <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Classes, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

A.   Whether Vibrant charged Overdraft Fees on transactions that did not overdraw an account at the time of authorization;

B.   Whether Vibrant charged more than one NSF Fee on the same item;

C.   Whether Vibrant breached its contract by charging Overdraft Fees on transactions that did not overdraw an account;

D.   Whether Vibrant breached its contract by charging multiple NSF Fees on the same item;

E.   Whether Vibrant breached the covenant of good faith and fair dealing by charging Overdraft Fees on transactions that did not overdraw an account;

F.   Whether Vibrant breached the covenant of good faith and fair dealing by charging multiple NSF Fees on the same item;

G.   Whether Vibrant was unjustly enriched by charging Overdraft Fees on transactions that did not overdraw an account;

H.   Whether Vibrant was unjustly enriched by charging multiple NSF Fees on the same item;

I.   Whether Vibrant developed and engaged in unlawful practices that mischaracterized or concealed its true Overdraft Fee and multiple NSF Fee practices;

J.   The proper method(s) by which to measure damages; and

K.   The declaratory and injunctive relief to which the Classes are entitled.

104.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes have been similarly affected by the actions of Defendant.

105.    <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and him counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.

106.    <u>Superiority of Class Action</u>: Plaintiff and the members of the Classes suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Classes is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

107.    <u>Risk of Inconsistent or Varying Adjudication</u>: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Classes would create a risk of: (a) inconsistent or varying

adjudications with respect to individual Class members which would establish incompatible standards of conduct for Vibrant as the party opposing the Classes; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

108.    <u>Action Generally Applicable to Class as a Whole</u>: Vibrant, as the party opposing the Classes, has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including the Covenant of Good Faith and Fair Dealing**
**(Individually and on behalf of the Classes)**

109.    Plaintiff incorporates by reference the preceding paragraphs.

110.    Plaintiff and Vibrant have contracted for banking services, as embodied in Vibrant's Deposit Agreement and related documentation.

111.    All contracts entered by Plaintiff and the Class members are identical or substantively identical because Vibrant's form contracts were used uniformly.

112.    Vibrant has breached the express terms of its own agreements as described herein when it charged Overdraft Fees on transactions that did not overdraw an account and when it assessed multiple NSF Fees on the same item.

113.    Under the law of Illinois, good faith is an element of every contract. All contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently,

the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

114.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

115.    Vibrant abused the discretion it granted to itself when it charged Overdraft Fees on transactions that did not overdraw an account and when it assessed multiple NSF Fees on the same item.

116.    In these and other ways Defendant violated good faith and fair dealing.

117.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiff and other members of the Classes.

118.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contracts.

119.    Plaintiff and members of the Classes have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

120.    Plaintiff and members of the Classes have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment
### (Individually and on behalf of the Classes)

121.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative. Plaintiff will not pursue him unjust enrichment claim if him breach of contract claim survives at the time of trial.

122.    Plaintiff, on behalf of himself and the Classes, assert a common law claim for unjust enrichment.

123.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly assessed improper bank fees on Plaintiff without him consent and by the use of misrepresentations and omissions.

124.    Vibrant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Classes. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and members of the Classes.

125.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Classes.

126.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

127.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification. Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

128.    The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Classes. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Classes all wrongful or inequitable proceeds received by it. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiff and the members of the Classes.

129.    Plaintiff and members of the Classes have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
**Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq***
**(Individually and on behalf of the Classes)**

130.    Plaintiff incorporates by reference the preceding paragraphs as if fully incorporated herein.

131.    Vibrant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.

132.    Section 2 of the ICFA, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

133.    Section 10a of the ICFA, 815 ILCS 505/10A, provides in relevant part:

Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .

* * *

26

(c)     Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

134.    Plaintiff and other Class members are "consumers" or "persons," as defined under the ICFA, 815 ILCS 505/1, *et seq*.

135.    Vibrant's conduct, as alleged in this complaint, occurred in the course of trade and commerce.

136.    Vibrant knowingly and intentionally employed an unfair and deceptive policy and practice of charging Overdraft Fees on transactions that were approved and authorized into a sufficient available balance and misrepresenting and failing to disclose its policy and practice of charging Overdraft Fees on transactions that were approved and authorized into a sufficient available balance.

137.    Vibrant also knowingly and intentionally employed an unfair and deceptive policy and practice of charging multiple NSF Fees on the same items and misrepresenting and failing to disclose its policy and practice of doing so.

138.    Vibrant also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated ICFA by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to Vibrant.

139.    Vibrant's statements and omissions were material and were likely to mislead Class members and, in fact, did mislead Class members.

140.    Vibrant made these statements and omissions with the intent that Class members would rely on them.

141.    As a direct and proximate result of Vibrant's conduct, Class members have suffered actual damages.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE**
**TRADE PRACTICES ACT, 815 ILCS 510, *et seq.***
**(Individually and on Behalf of the Classes)**

142.    Plaintiff realleges and reincorporate by reference the preceding paragraphs as if fully set forth herein.

143.    Defendant is a "person" within the meaning of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*. (the "Act").

144.    Plaintiff and members of the proposed Class are "persons" within the meaning of the Act.

145.    Defendant's checking accounts and banking services are "goods" or "services" within the meaning of the Act.

146.    As described above, Defendant engaged in deceptive trade practice when, in the course of Defendant's business, Defendant: (a) represented and continues to represent that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or he does not have, 815 ILCS 510/2 (5); (b) represented and continues to represent that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another, 815 ILCS 510/2 (6); (c) advertised and continues to advertise goods or services with intent not to sell them as advertised, 815 ILCS 510/2 (9); (d) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding, 815 ILCS 510/2 (12); and (e) for other such violations of the Act that discovery will uncover.

147.    In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

148.    Defendant's deceptive practices deceived Plaintiff and Class members and deceived a substantial segment of the Illinois public.

149.    Defendant's deception is material as it influenced purchasing decisions.

150.    Defendant continues to engage in these deceptive and misleading acts and practices, and Plaintiff and Class members continue to be damaged by Defendant's conduct.

151.    Defendant's actions as described herein were done with conscious disregard of Plaintiff's rights and Defendant was wanton and malicious in Defendant's concealment of the same.

152.    As a direct and proximate result of Defendant's violations of law, Plaintiff has been injured.

153.    Defendant's practices, acts and courses of conduct in connection with the sale of its banking services, as described above, are likely to mislead a reasonable consumer and the Classes are entitled to injunctive relief prohibiting Defendant from continuing in the future the unlawful, unfair, or fraudulent practice as described herein.

154.    Plaintiff, individually and as a member of the Classes, has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above.

155.    Accordingly, Plaintiff and Class members are entitled to injunctive relief to prohibit Defendant from continuing to perpetrate its deceptive scheme as more fully described herein.

156.    In bringing this action, Plaintiff has engaged the services of attorneys and has incurred reasonable legal expenses in an amount to be proved at trial.

157.    Plaintiff is also entitled to recover him attorneys' fees, costs, and expenses.

**FIFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Individually and on Behalf of the Classes)**

158.    Plaintiff realleges and reincorporates the allegations contained within each of the foregoing allegations as if fully rewritten.

159.    An actual case and controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendant denies, that Defendant is not allowed to (a) charge Overdraft Fees on transactions that did not overdraw an account and (b) charge more than one NSF fee on the same item under Illinois law or under the terms of the Deposit Agreement.

160.    Plaintiff and Class members seek a declaration that Defendant's acts and practices are unlawful as described herein and issue permanent injunctive relief to enjoin Defendant from continuing to engage in these deceptive, false, and misleading acts and practices.

161.    Plaintiff and Class members have no adequate remedy at law to deter the continuing activity on the part of Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on him own behalf and on behalf of the Classes respectfully request that the Court:

(a)    Certify this case as a class action pursuant to 735 ILCS 5/2-801, appointing Plaintiff as class representative and appointing Plaintiff's counsel as Class counsel;

(b)    Award Plaintiff and the Classes actual, incidental, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages, restitution, any applicable penalties and interest, authorized attorneys'

fees, interest, and costs, and any further relief as the Court deems just equitable, and proper;

(c)     Declare Vibrant's practices outlined herein to be unlawful;

(d)     Enjoin Vibrant from engaging in the practices outlined herein; and

(e)     Grant Plaintiff and the Classes a trial by jury.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 6, 2019

Respectfully submitted,

*By: /s/ Kyle A. Shamberg*
Katrina Carroll, Esq.*
kcarroll@carlsonlynch.com
Kyle A. Shamberg, Esq.
kshamberg@carlsonlynch.com
**CARLSON LYNCH, LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Phone No. (312) 750-1265
Fax No. (312) 212-5919

Todd Carpenter*
**CARLSON LYNCH, LLP**
1350 Columbia Street
Suite 603
San Diego, California 92101
P (619) 762-1910
F (619) 756-6991

* to seek admission *pro hac vice*

***Counsel for Plaintiffs and the Proposed Plaintiff Class***